FILED
2012 Feb-21  PM 04:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | |
|---|---|
| ALLY FINANCIAL INC., et al., | ] |
| | ] |
| Plaintiffs, | ] |
| | ] |
| vs. | ]   6:10-cv-00779-LSC |
| | ] |
| WESLEY GOODSON CHRYSLER | ] |
| DODGE JEEP LLC, et al., | ] |
| | ] |
| Defendants. | ] |

consolidated with

| | |
|---|---|
| UNITED STATES OF AMERICA, | ] |
| | ] |
| Plaintiff, | ] |
| | ] |
| vs. | ]   6:11-cv-00952-LSC |
| | ] |
| CURRENCY, $9,360.95 in U.S. | ] |
| Currence on deposit in account | ] |
| number XXXX60-10, et al., | ] |
| | ] |
| Defendants. | ] |

MEMORANDUM OF OPINION

I.      Introduction.

The Court has for consideration a number of motions for summary judgment

filed by most parties in this action.  Intervenor Plaintiff Nissan Motor Acceptance

Corporation ("Nissan") moves for partial summary judgment against Wesley Goodson Chrysler Dodge Jeep, LLC ("Goodson Dealership"), on its breach of contract claim. (Doc. 122.) Plaintiff Ally Financial, Inc. ("Ally"), requests summary judgment with respect to counterclaims filed by Goodson Dealership and Wesley Goodson Management Company, LLC ("Goodson Management") (collectively, "Goodson Entities"). (Doc. 159.) Ally also moves for entry of partial summary judgment against Defendant Garve W. Ivey, Jr. ("Ivey"). (Doc. 172.) The Goodson Entities filed a motion for summary judgment with regard to the claims made by Ally. (Doc. 175.) And, Ivey moves for summary judgment without specifying any claims. (Doc. 156.) Deadlines for submissions have passed, and the issues raised in these motions are ripe for decision. Upon full consideration of the legal arguments and evidence cited by the parties, it is the opinion of this Court that Nissan's motion for summary judgment is due to be granted in part and denied in part, and the remaining summary judgment motions are due to be denied.

1.     Facts.[1]

_____

[1]The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Goodson Dealership was a new and used car dealership operating in Jasper, Alabama. On October 24, 2006, Chrysler Motor Division approved Goodson Dealership as a new car dealership franchise for Chrysler Dodge Jeep in Jasper, Alabama. Chrysler Financial approved Goodson Dealership for floor plan financing in the amount of three million dollars for new vehicles and one million dollars for used vehicles. Goodson Dealership established Goodson Management as a management company for the dealership in November 2006.

In May 2009, General Motors and Chrysler filed for bankruptcy. As a requirement for receiving TARP funds, Ally became Chrysler's preferred lender and took over for Chrysler Financial, destroying the floor plan agreement between Chrysler Financial and Goodson Dealership. Ally subsequently contacted the Goodson Entities with an offer for funding of Goodson Dealership.

In June 2009, Ally approved Goodson Dealership for temporary floor plan financing and assured the dealership that it would be notified of a decision on permanent floor plan financing within sixty days. Ally did not make its decision within sixty days. An Ally employee informed Robert Wesley Goodson, the dealership "CEO," that approval was delayed because Ally assumed the dealership could not pay the required amount of $1,000,000.00. On December 5, 2009, Goodson Dealership took out a loan from the Small Business Administration to meet the $1,000,000.00

demand.  Goodson Dealership executed a Master Wholesale Agreement ("MWA") and Inventory Financing and Security Agreement ("IFSA") with Ally on December 10, 2009.  Ally then approved Goodson Dealership for permanent floor plan financing for new and used automobiles on December 16, 2009.  (The MWA and IFSA shall hereinafter be referred to collectively as the "Agreements".)  The parties agree that the terms of the IFSA are binding between the parties as if they were set out in the MWA.

Under the Agreements, Ally advanced funds directly to Goodson Dealership, or to vehicle manufacturers, distributors, and others ("Vehicle Sellers") on behalf of Goodson Dealership, so that Goodson Dealership could acquire new and used vehicles for retail sale or lease. The funds advanced directly to Goodson Dealership constituted "Inventory Financing," and the vehicles acquired with the Inventory Financing are "Inventory Financed Vehicles." When Goodson Dealership sold, leased, or otherwise disposed of an Inventory Financed Vehicle, it had a contractual obligation under the Agreements to pay off the principal amount Ally loaned to the Dealer or Vehicle Sellers for that vehicle.

In return for receiving Inventory Financing from Ally, Goodson Dealership granted Ally a first priority, purchase-money security interest on Goodson

Dealership's entire vehicle inventory and other assets.  Ally perfected that interest by filing UCC-1 Financing Statements with the State of Alabama.

According to the IFSA, Goodson Dealership defaults under the Agreements in the event of:

> 1. Failure of Dealer to pay when due the full amount owing [Ally] under Section III. B.[2] and C.[3] above.
> 2.  The breach of, or the failure of Dealer to fully comply with or duly perform, any term, condition, or promise of this Agreement, any other Obligation or any Other Financing Accommodation.
> 3.  Any representation, statement, or warranty made by Dealer to [Ally] in this Agreement or otherwise, which was false or materially misleading when made.
> 4.  The inability of Dealer to pay debts as they mature, or any proceeding in bankruptcy, insolvency, or receivership, instituted by or against Dealer or Dealer's property.

(IFSA § III. H.)  If any of these events of default occur, the Agreements provide that Ally has, at a minimum, the right to:  immediately demand payment of all Obligations; repossess its collateral without demand or further notice, with or without legal process, and dispose of its collateral in a commercially reasonable manner not less than 10 days after giving Dealer written notice of the public or private sale as permitted by law; and institute proceedings in a proper court of law or equity to enforce any and all

---

[2]This section details "Interest, Principal Reductions, Other Charges and Fees."  (IFSA § III. B.)

[3]This section details "Payments by Dealer."  (IFSA § III. C.)

provisional remedies, including injunctive relief, an action for possession of collateral, an order for an accounting, the appointment of a receiver or examiner, or the like.

Ally conducted an audit of Goodson Dealership on March 29, 2010. Ally filed this lawsuit on March 31, 2010, and immediately seized the dealership's vehicles and other property. Ally claimed that Goodson Dealership sold, leased, or otherwise disposed of Inventory Financed Vehicles without paying Ally the amount financed on those vehicles. Ally also maintained that checks were drawn on Goodson Dealership's operating bank accounts and made payable to: Goodson Management in the amount of $321,500.00 in December 2009; to Ivey in the amount of $612,500.00 from January 27, 2010, through March 2010; and to Sherry Goodson ("Mrs. Goodson") in the amount of $50,000.00 in March 2010. Defendants contend that the $50,000.00 paid to Mrs. Goodson constituted repayment for a loan; money paid to Ivey was payment for legal services rendered; and checks issued to Goodson Management were made "in the regular course of business." (Doc. 175 at 3.)

In June 2009, Goodson Dealership also entered into an "Automotive Wholesale Financing and Security Agreement" with Nissan ("Financing Agreement"). Under the terms of the Financing Agreement, Nissan agreed to finance Goodson Dealership's purchase of certain new and used automobile inventory in return for a first priority security interest in all of Goodson Dealership's property. Nissan perfected that

security interest by filing a financing statement with the Alabama Secretary of State on June 30, 2009. The Financing Agreement required Goodson Dealership to "promptly pay [Nissan] the amount due . . . together with interest" when a financed automobile was sold. (Financing Agreement § 2.3.2.) If Goodson Dealership defaulted, the Financing Agreement required the dealership to pay Nissan "on or before the close of the next business day following any such Disposition, . . the entire proceeds of such Disposition." (*Id.*)

On August 12, 2009, Nissan executed an Intercreditor Agreement with GMAC Bank and a Collateral Subordination Agreement with Chrysler Financial. Those agreements were superceded by a new Intercreditor Agreement with Ally on January 26, 2010. The Intercreditor Agreement provides that Nissan has a first priority security interest in all vehicles owned by Goodson Dealership that are specifically financed or manufactured by Nissan, and Ally has a first priority security interest in all vehicles owned by the dealership that are specifically financed by Ally or manufactured by Chrysler.

After Ally filed this lawsuit, Nissan conducted an inspection of Goodson Dealership. Nissan determined that Goodson Dealership had sold collateral pledged to Nissan "out of trust." Specifically, Nissan claimed that fourteen vehicles were sold

by Goodson Dealership without part or all sale proceeds being remitted to Nissan, as required by the Financing Agreement.

On April 5, 2010, Robert Wesley Goodson, as CEO of Goodson Dealership, executed a "Voluntary Surrender," acknowledging that Goodson Dealership was in default under the Financing Agreement. The Voluntary Surrender allowed Nissan to take possession of sixty-one vehicles and apply the amounts realized from their disposition to any amounts owed to Nissan. Nissan maintains that it has only been able to recover one of the fourteen vehicles sold "out of trust." The remaining vehicles were sold and the proceeds were applied to the amount owed. Nissan contends that Goodson Dealership still owes $451,296.17, and $145,000.00 in legal fees.

III.    Standard.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[4]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[4]Although Fed. R. Civ. P. 56 was amended on December 1, 2010, "the standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56 advisory committee's note (2010 Amendments).

The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also* Fed. R. Civ. P. 56(c). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp.*, 281 F.3d at 1224 (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.   Analysis.

A.   Nissan's Motion for Summary Judgment.

Nissan has moved for entry of partial summary judgment against Goodson Dealership in the amount of $596,296.17 on its breach of contract claim. (Doc. 122.) Nissan argues that there is no dispute that: (1) Goodson Dealership defaulted under

the Financing Agreement; (2) after the reasonable sale of seized collateral, Goodson Dealership continues to owe $451,297.17; and (3) Nissan has incurred $145,000.00 in legal fees attempting to enforce the Financing Agreement.  Goodson Dealership contends that summary judgment cannot be entered because genuine disputes of material fact exist regarding the events constituting default under the Financing Agreement and the amount of damages.

Goodson Dealership disputes Nissan's assertion that the dealership defaulted under the Financing Agreement when it sold certain vehicles "out of trust."  A party asserting that a fact is genuinely disputed must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  Goodson Dealership does not proffer any evidence of its own; it only argues that Nissan's evidence is insufficient to prove the purported event of default.  However, for the Court's purposes, it is immaterial what event(s) constituted default under the parties' agreement.  Goodson Dealership does not dispute that Robert Wesley Goodson, as CEO of the dealership, signed a Voluntary Surrender agreement on April 5, 2010.  In that Voluntary Surrender, Goodson admitted that Goodson Dealership was in default under the Financing Agreement.  (Doc. 123-1 at 43-44.)  Since default has been admitted, the Court turns to the issue of damages.

Goodson Dealership attacks Nissan's evidence of damages. Again, without introducing any counter-evidence, Defendant argues that Nissan's exhibits are contradictory and inconsistent. Goodson Dealership also contends that Nissan's summary of "Obligations Due" is not supported by substantial evidence. Namely, there is no documentation showing Nissan is entitled to the vehicles listed and there is no support for an alleged $2,800.00 in "contractor expenses." (Doc. 149 at 6.)

"If the moving party bears the burden of proof at trial, it must demonstrate that 'on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.'" *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc)). While Nissan has convinced the Court in its reply brief that its evidence is not contradictory, the Court agrees with the defendant that a summary spreadsheet and list of "Obligations Due" are insufficiently detailed to prove Nissan's damages. There is no evidence showing Nissan has an interest in the missing vehicles not identified in the Voluntary Surrender agreement. Nissan has not cited to evidence establishing that Goodson Dealership ever had possession of the missing vehicles. Nissan also fails to point to evidence supporting the amounts of $2,800.00 in "Contractor Expenses," $35,821.00 in "Interest & Insurance Fees," and other "Miscellaneous Repo Expenses." (Doc. 123-1 at 47.) Accordingly, while Nissan

has established that it is entitled to summary judgment on its claim that Goodson Dealership defaulted under the Financing Agreement, the issue of damages must proceed to trial.

B.    Ivey's Motion for Summary Judgment.

Defendant Garve Ivey filed a motion for summary judgment that says only:

1.    There is no dispute of material fact in this case.
2.    The defendant is entitled to a judgment as a matter of law.

(Doc. 156.)  Federal Rule of Civil Procedure 56 provides that "A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought."  Ivey does not identify any claims on which he seeks summary judgment.  He does not provide any legal argument or cite to specific facts in the record that show there is no genuine dispute of fact in this case. It is not the Court's responsibility to make legal arguments for Ivey.  His motion for summary judgment will be denied.

C.    Ally's Motion for Summary Judgment Against Ivey.

Ally moves for partial summary judgment against Ivey with regard to Counts VII (conversion), VIII (Alabama Fraudulent Transfer Act), IX (imposition of a constructive trust), and X (conspiracy) of its Amended Complaint. (Doc. 172.) Ally's motion for summary judgment was filed several weeks after Ivey's purported motion

for summary judgment.  Ivey did not file a response to Ally's motion.  According to Appendix II of the Court's Uniform Initial Order, "All material facts set forth in the statement required of the moving party will be deemed admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment." (Doc. 30 at 17.)  Rule 56 requires that a party opposing summary judgment cite to particular materials in the record, and "[t]he court need consider only the cited materials."   Fed. R. Civ. P. 56(c)(3).   Accordingly, the proposed "uncontested" facts set forth in Ally's motion for summary judgment against Ivey are deemed undisputed, provided they are followed by citations to the evidentiary record.[5]  Among these facts are the following:

1.  Ivey executed a Real Estate Purchase Agreement with Goodson on July 18, 2009, for the purchase of a building ("Building") at a price of $2.25 million, before Ivey had any ownership interest in the Building.  A check in the amount of $562,500.00 was issued to Ivey from Goodson Management on June 25, 2009.  The check says that it is a "Down Payment for Real Estate."  Goodson Management was not a party to the purchase agreement.  Upon receipt of the

---

[5]Appendix II to the Court's Uniform Initial Order requires that proposed facts must be supported by specific references to evidentiary submissions. (Doc. 30 at 16 & n.3.)  Throughout its facts section, Ally makes arguments about what it believes the facts mean.  Those arguments are not "facts," and they are not considered undisputed. (*See, e.g.*, "It is clear from the facts that the checks were backdated in order to effect a subterfuge on all parties . . . ." (Doc. 172 ¶10.).)

check, Ivey endorsed the check to Goodson, individually.  Goodson deposited the money into Goodson Dealership's accounts.

2.  On June 26, 2009, Goodson Dealership executed a promissory note in the amount of $562,500.00, payable on demand to Ivey.

3.  Ivey later paid $500,000.00 for the Building as part of a settlement with the building's owner.  The deed was transferred to Ivey's law firm on February 17, 2010, and recorded on February 18, 2010.  On the same date the deed was recorded, Ivey conveyed the Building to Goodson and Jeffrey W. Long for $2.25 million.

4.   The sole source of Goodson Management's revenue was Goodson Dealership.  Goodson Dealership's revenue was generated through the sales of vehicles.

5.  As new owners of a Building, Goodson and Long entered into a Lease Agreement with Ivey's law firm, dated February 18, 2010.  The fixed monthly rental was set at $15,000.00.  However, Ivey paid rent sporadically, and never more than $10,000.00 per month, the amount needed to satisfy the outstanding balance on the purchase of the Building.

6. From March 1, 2010, through April 5, 2010, Ivey negotiated and cashed 27 $10,000.00 checks issued by Goodson Dealership.   The 27 checks were

purportedly dated over a two-year period, but it is clear that the checks were not issued in sequence.  A check numbered 1179 is dated January 1, 2009, while a check numbered 1196 is dated March 1, 2008.  Ivey conceded the checks were not received on the dates written.  He believed they were received in early 2010.

7.  All of the checks were made payable to Ivey, personally, and not his law firm. Although Ivey maintains that the checks were issued as payment for legal services to Goodson Dealership, Goodson Management, Goodson individually, and Goodson's family members, there are no documents evidencing an attorney-client relationship.  There are no engagement letters, time records, or bills issued for services rendered.

8.  Ally conducted an audit of Goodson Dealership on March 29, 2010.  On March 29 and 30, 2010, Goodson issued checks to Ivey drawn from Goodson Dealership's bank account, in the amounts of $222,500.00 and $120,000.00, purportedly to repay the promissory note issued in June 2009.

Ally contends that these facts entitle it to judgment as a matter of law on its claims under the Alabama Fraudulent Transfer Act, its conversion claim, and its request for the imposition of a constructive trust.  Ally is the Plaintiff in this matter. Ally bears the ultimate burden of proof on these claims.  Ally premises its right to judgment on the purported "fact" that the money at issue in these transfers

constitutes the proceeds of Ally's collateral.  It is undisputed, however, that Ally had a first priority perfected security interest in the assets of Goodson Dealership, but that interest excludes the proceeds of vehicles acquired with Nissan financing.  (Oliver Aff. ¶¶ 5-6.)  Ally has not introduced evidence to show that the money at issue can be shown to be the proceeds of its collateral, to the exclusion of Nissan's collateral. Without addressing this issue, Ally has not shown that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  *Irby*, 44 F.3d at 953.

Because Ally's motion does not satisfactorily address the issue of conclusively identifying whose proceeds are the subject of the transfers described above, it has not established damages for its conspiracy claim.  *See, e.g.*, *Haapanen v. Bogle*, 643 So. 2d 547, 551 (Ala. 1994) (quoting *Keller v. Security Fed. Savings & Loan Ass'n*, 55 So. 2d 151, 155 (Ala. 1989)).  Moreover, when the Court views the facts in the light most favorable to the defendant, Plaintiff also fails to cite to sufficient evidence to establish the requisite agreement to achieve an unlawful purpose through unlawful means.  Ally's motion for entry of partial summary judgment against Ivey will be denied.

D.  Ally's Motion for Summary Judgment Against the Goodson Entities.

Ally also moves for summary judgment with respect to the counterclaims filed by the Goodson Entities.  The Goodson Entities asserted causes of action against Ally

for fraud, suppression, conversion, negligence, wantonness, breach of contract, abuse of process, and unjust enrichment.  On September 15, 2011, the Court dismissed the claims for fraud and abuse of process.  (Doc. 147.)  Ally moves for summary judgment on the remaining causes of action, arguing that the Goodson Entities have insufficient evidence to prove any of the claims.  Ally cites the fact that CEO Robert Wesley Goodson invoked his Fifth Amendment privilege, and the 30(b)(6) representative, Mrs. Goodson, testified that she had little to no knowledge about the legal claims.[6]

In response to Ally's summary judgment motion, the Goodson Entities contend that they have "no obligation to come forward with anything," because Ally has not met its burden "to establish the nonexistence of any genuine issue of material facts." (Doc. 173 at 4.)  The Goodson Entities confuse the legal standard.  A movant may meet its summary judgment burden by presenting evidence showing that there is no genuine dispute of material fact, *or by showing that the nonmoving party has failed to present*

---

[6]Ally also filed a Motion for Sanctions, arguing that the Goodson Entities' counterclaims should be dismissed for delay and frustration of the discovery process, including failure to provide a 30(b)(6) representative with sufficient knowledge of this case. (Doc. 160.)  The Goodson Entities bear the burden of proof on their counterclaims.  If they have no evidence to support their claims because Goodson Dealership's CEO invoked his Fifth Amendment privilege and Mrs. Goodson lacks knowledge of the facts, it is unnecessary for this Court to enter sanctions.  Accordingly, the motion for sanctions is DENIED.

The Goodson Entities filed a counter-motion for sanctions.  (Doc. 170.)  The Goodson Entities contend that Ally's filing of a motion for sanctions and a motion for summary judgment merits sanctions under Rule 11 because the pleadings lack a reasonable factual basis and have no reasonable chance of success. After full consideration, this counter-motion for sanctions is also DENIED.

*evidence in support of some element of its case* on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (emphasis added). Ally argues that the Goodson Entities do not have the evidence to prove their claims. Now, the Goodson Entities must "go beyond the pleadings and by . . . affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotations omitted).

  1. Breach of Contract.

  "The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Shaffer v. Regions Financial Corp.*, 29 So. 3d 872, 880 (Ala. 2009) (quoting *Reynolds Metals Co. v. Hill*, 825 So. 2d 100, 105 (Ala. 2002)). The Goodson Entities contend that Ally breached the terms of the IFSA when it declared Goodson Dealership in default under the Agreements before allowing the dealership a period of three to sixty days to pay for vehicles missing from the lot.[7]

---

[7]It appears undisputed that Goodson Management does not have privity of contract to make a claim that Ally breached the terms of the IFSA. As explained further below, the parties may clarify this issue at trial.

The IFSA provides that Goodson Dealership must "fully, promptly, and faithfully" pay Ally its obligations under the Agreement when an Inventory Financed Vehicle is sold, disposed of, lost, missing, or "no longer in possession of the Dealer." (IFSA § III. C. 2.(a)), *or* "on demand by [Ally], except that *absent Default* (as defined in Section III. H. below), Dealer is permitted sixty (60) days to pay in full after demand is made" (*Id*. § III. C. 2.(c)). "Prompt" payment is defined as "immediately after the event causing the payment to become due and payable (e.g., demand by [Ally], sale of a Vehicle by Dealer, and the like). *At its election*, [Ally] may permit more time between the event and payment due date . . . ." (*Id*. § III. C. 5.)

According to the terms of the contract, then, when Inventory Financed Vehicles were no longer in Goodson Dealership's possession—whether they were sold, missing, or lost—immediate payment was due to Ally. Ally could elect to grant more time for payment, but it is not required under the IFSA. The sixty day provision only applies when Ally makes a generalized demand for payment, and only when Goodson Dealership was not in default. It is undisputed that approximately $4 million worth of vehicles were missing from Goodson Dealership's lot when Ally conducted its audit on March 29, 2010. It is undisputed that Ally had not received payment for those vehicles, nor was payment issued on those vehicles. Under Section III. H. 1. of the IFSA, Goodson Dealership was in default. The Goodson Entities have failed to show

that Ally had any obligation to give them more time to pay for the missing vehicles.[8]
In short, the Goodson Entities have not proferred sufficient evidence of Ally's
nonperformance under the IFSA, nor have they cited to any evidence establishing
damages as a result of the purported failure to allow them three to sixty days to pay for
the missing vehicles.

       2.     Suppression.

"The elements of a claim of fraudulent suppression are: (1) a duty on the part
of the defendant to disclose facts; (2) concealment or nondisclosure of material facts
by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his
or her injury."  *DGB, LLC v. Hinds*, 55 So. 3d 218, 231 (Ala. 2010) (quotations
omitted).  The Goodson Entities contend that when Goodson Dealership "inquired
about the status of the permanent floor plan financing, [Ally] was under a duty to
disclose not only the fact that it did not want to extend the financing to the Dealer
whether he met the term sheet requirement or not, but also the facts materially related

---

[8]The Goodson Entities argue that there could be valid reasons for vehicles to be "missing"
under the IFSA.  (Doc. 173 at 16-17.)  This is the Goodson Entities' breach of contract claim.  The
Goodson Entities have the burden to come forward with evidence showing that there were valid
reasons for the vehicles at issue to be "missing."  They have not done so.

     Moreover, even if the Goodson Entities were entitled to additional time to pay for missing
vehicles, under the IFSA, the purported "three to sixty days" would be counted from the date of
"the event causing the payment to become due and payable"– the date the vehicles went missing.
(IFSA § III. C. 5.)  The Goodson Entities have not established that all of the missing vehicles left
Goodson Dealership's lot within three to sixty days of the date of Ally's audit.

to the inquired ones such [as Ally's] intention to reduce its dealers' network to cut costs [sic]." (Doc. 173 at 26-27.)

The Goodson Entities' suppression claim hinges on its argument that Ally had a duty to disclose because Goodson Dealership made a specific inquiry. (*Id.* at 173, quoting *Jackson Co. v. Faulkner*, 315 So. 2d 591, 599-600 (Ala. Civ. App. 1975) ("Where one responds to an inquiry, it is his duty to impart correct information, and he is guilty of fraud if he denies all knowledge of a fact which he knows to exist, or if he gives equivocal, evasive, or misleading answers calculated to convey a false impression, even though literally true as far as they go, or if he fails to disclose the whole truth.").) In support of this argument, the Goodson Entities cite to excerpts from the deposition testimony of Ally employee, Greg Shultz. (*Id.* at 26.) Mr. Shultz testified only that CEO Robert Wesley Goodson asked "are you going to do the permanent floor plan [?]" (*Id.*, quoting Shultz Dep. at 39.) This question was asked when Goodson allegedly received a letter saying the interim program was ending. (Shultz Dep. at 37.) The Goodson Entities do not cite to any testimony that would lead a reasonable jury to conclude that Mr. Shultz's response to this question was "equivocal, evasive, or misleading." They also fail to cite to any evidence that Mr. Shultz or any other Ally representative had knowledge at that time that Ally did not

want to extend financing and purportedly intended to terminate the dealership even if the Goodson Entities met all the terms of their Agreements with Ally.

      3.  Unjust Enrichment.

In Alabama, "one is unjustly enriched if his retention of a benefit would be unjust." *Welch v. Montgomery Eye Physicians, P.C.*, 891 So. 2d 837, 843 (Ala. 2004) (quoting *Jordan v. Mitchell*, 705 So. 2d 453, 458 (Ala. Civ. App. 1997)). "Retention of a benefit is unjust if (1) the donor of the benefit . . . acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been unjustly enriched." *Id.* (quoting *Jordan*, 705 So. 2d at 458).

The Goodson Entities contend that Ally was unjustly enriched when it fraudulently suppressed that it "did not want to extend financing" but took one million dollars from them as a condition for a permanent floor plan. (Doc. 173 at 19-20.)  As outlined above, the Goodson Entities have not cited to sufficient evidence to establish fraudulent suppression.  They also fail to proffer sufficient evidence to convince a reasonable jury that Ally engaged in "unconscionable conduct, such as fraud, coercion,

or abuse of a confidential relationship" in order to obtain the one million dollars at issue.

       4.  Negligence.

"To establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994) (citing *Albert v. Hsu*, 602 So. 2d 895, 897 (Ala. 1992)).  Other than a broad denial that summary judgment is not due to be entered, the Goodson Entities do not make any legal argument or cite to any facts in opposition to Ally's contention that Goodson Dealership has no evidence to support a claim for negligence.  (Doc. 173 at 25-26.)

The Goodson Entities do argue that Goodson Management has a negligence claim, despite not having privity of contract with Ally.  The Goodson Entities cite *QORE, Inc. v. Bradford Bldg. Co., Inc.*, 25 So. 3d 1116, (Ala. 2009), for the proposition that: "where one party to a contract assumes a duty to another party to that contract, and it is foreseeable that injury to a third party-not a party to the contract-may occur upon a breach of that duty, the promissor owes that duty to all those within the foreseeable area of risk.  A breach of such a duty that results in injury to a third party who is "within the foreseeable area of risk is actionable negligence."  (quotations omitted).  Goodson Management contends that Ally was under a contractual duty to

allow Goodson Dealership three to sixty days to remit payment for missing vehicles, and it suffered injury as a result of breach of that duty.  (Doc. 173 at 26.)   As determined above, however, the Goodson Entities have not established any such breach of a contractual duty.  Goodson Management also fails to cite to any evidence establishing that failure to allow such payment in the purported time period "forced [it] out of business and [caused it to suffer] other financial damages."  (*Id.*)

   5.  Wantonness.

  "To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty.  To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains."  *Martin*, 643 So. 2d at 567 (citing *Smith v. Davis*, 599 So. 2d 586 (Ala. 1992)).  The Goodson Entities contend that Ally wantonly and wilfully delayed permanent financing in order to force the entities to take out loans, burn through working capital, and force them out of business. (Doc. 173 at 22.)  Yet, the Goodson Entities fail to cite to sufficient evidence to convince a reasonable jury of these facts.  It is undisputed that there was a dely in issuing permanent floor plan financing.  However, the Goodson Entities ask the Court to infer knowledge and wrongful intent from one employee's testimony that a delay in financing might necessitate finding other options for funding.  (*Id*. at 20, quoting

Niemeyer Dep. at 27.) However, the Court has reviewed the cited deposition, and the employee clearly states that he does not know whether the delay was due to Goodson's failure to comply with the term sheet or [Ally's] failure to "okay" the term sheet. (Niemeyer Dep. at 26.) The testimony is wholly insufficient to establish wanton or wilful conduct on the part of Ally.

> 6. Conversion.

"The elements of the tort of conversion have been long established, and these elements are relatively simple in their application to any given set of circumstances. To sustain a claim of conversion, there must be (1) a wrongful taking; (2) an illegal assertion of ownership; (3) an illegal use or misuse of another's property; or (4) a wrongful detention or interference with another's property." *Drennen Land & Timber Co. v. Privett*, 643 So. 2d 1347, 1349 (Ala. 1994). Again, Ally contends that the Goodson Entities have no evidence to support a conversion claim. (Doc. 159 at 2, 15.) The Goodson Entities counter only that Ally has not "negate[d] the existing issues of material fact that support the claim." (Doc. 173 at 29.) As explained previously, when a movant does not bear the ultimate burden of proof on a claim, it may meet its summary judgment burden by showing there is no genuine dispute of material fact, *or* by showing that the party who bears the burden of proof does not have evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Ally has done

the latter, and the Goodson Entities failed to point to any evidence that disputes this contention.

Based on the foregoing, the Court should enter summary judgment in favor of Ally on these counterclaims. However, for the reasons outlined in the following section, the Court will allow the Goodson Entities the opportunity to present further evidence on these claims, if such evidence exists, at trial. Summary judgment will be denied.

E.  The Goodson Entities' Motion for Summary Judgment Against Ally.

The Goodson Entities have moved for summary judgment on Ally's claims for seizure of personal property, breach of loan documents, foreclosure of security interest, breach of guaranty, declaratory judgment, conversion, conspiracy, violation of the Alabama Fraudulent Transfer Act, and imposition of a constructive trust. (Doc. 175.) The Goodson Entities contend that Ally has insufficient evidence to support its claims. Surprisingly, Ally failed to file an opposition to the Defendants' motion.

The failure to make any argument or cite to any evidence in response to a defendant's motion for summary judgment indicates that the claim has been abandoned. *See, e.g., Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding

that the issue has been abandoned."); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.")

However, it is evident from the facts that have been presented to this Court that granting summary judgment against Ally because of counsel's oversight would simply result in a motion to reconsider, followed by additional argument and evidence, and a delay of the trial, which is set for April 16, 2012. This case must come to an end. The Court will deny summary judgment with regard to Ally's claims against the Goodson Entities, and with regard to the Goodson Entities' counterclaims against Ally. The Court will resolve all of these claims at once in a bench trial.

V.    Conclusion.

For the reasons outlined above, Nissan's motion for partial summary judgment will be granted in part and denied in part. The remaining motions for summary judgment will be denied. A separate order will be entered.

Done this 21st day of February 2012.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
139297